Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
September 23, 2019

**2019 CO 80**

**Nos. 18SC34 and 18SC35, *People v. Iannicelli*, and *People v. Brandt*—Jury Tampering—First Amendment—"Juror"—"A Case."**

This case requires the supreme court to construe the terms "juror" and "case" in Colorado's jury tampering statute, section 18-8-609(1), C.R.S. (2019), which provides that a person commits jury tampering if "with intent to influence a juror's vote, opinion, decision, or other action in a case," he or she attempts "directly or indirectly to communicate with a juror other than as a part of the proceedings in the trial of the case."

The court concludes that for purposes of the jury tampering statute, a "juror" is defined as set forth in section 18-8-601(1), C.R.S. (2019), and therefore includes persons who have been drawn or summoned to attend as prospective jurors. The court further concludes that the jury tampering statute's references to "a case" and "the case" make clear that for purposes of that statute, a defendant's effort to influence a juror must be directed at a specifically identifiable case.

Because the People did not charge the defendants with attempting to influence a juror in a specifically identifiable case, the court affirms the judgment of the division below, although the court's reasoning differs in some respects from that of the division.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2019 CO 80

### Supreme Court Case No. 18SC34

*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 16CA210

### Petitioner:

The People of the State of Colorado,

v.

### Respondent:

Mark Iannicelli.

### Judgment Affirmed
*en banc*
September 23, 2019

\* \* \* \* \*

### Supreme Court Case No. 18SC35

*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 16CA211

### Petitioner:

The People of the State of Colorado,

v.

### Respondent:

Eric Patrick Brandt.

## Judgment Affirmed
*en banc*
September 23, 2019

---

**Attorneys for Petitioner:**
Beth McCann, District Attorney, Second Judicial District
Robert M. Russel, Senior Chief Deputy District Attorney
*Denver, Colorado*

**Attorneys for Respondents:**
Killmer, Lane & Newman, LLP
David A. Lane
Andrew McNulty
*Denver, Colorado*

**Attorneys for Amicus Curiae American Civil Liberties Union:**
American Civil Liberties Union Foundation of Colorado
Sara R. Neel
*Denver, Colorado*

American Civil Liberties Union Foundation
Naomi Gilens
*New York, New York*

**Attorney for Amicus Curiae Cato Institute:**
Millennial Policy Center
Joseph Greenlee
*Denver, Colorado*

**JUSTICE GABRIEL** delivered the Opinion of the Court.
**JUSTICE SAMOUR** dissents, and **CHIEF JUSTICE COATS** joins in the dissent.

¶1     This case, which requires us to construe Colorado's jury tampering statute, section 18-8-609(1), C.R.S. (2019), implicates both significant issues of individual rights to free speech and the state's also significant interest in ensuring the fair and orderly administration of justice.

¶2     Defendants Mark Iannicelli and Eric Brandt stood in the plaza square adjacent to the Lindsey-Flanigan Courthouse in Denver and asked people entering the courthouse whether they were reporting for jury duty. If any of these people answered affirmatively, then Iannicelli and Brandt would hand them one or more brochures discussing the concept of jury nullification, which the brochures defined as the process by which a jury in a criminal case acquits the defendant regardless of whether he or she has broken the law in question. As a result of this conduct, the People charged Iannicelli and Brandt with multiple counts of jury tampering under section 18-8-609(1), which provides that a person commits jury tampering if "with intent to influence a juror's vote, opinion, decision, or other action in a case," he or she attempts "directly or indirectly to communicate with a juror other than as a part of the proceedings in the trial of the case."

¶3     Iannicelli and Brandt moved to dismiss these charges, contending that section 18-8-609(1) violates the First Amendment both on its face and as applied to them because, among other reasons, the statute results in an unconstitutionally overbroad restriction on free speech. The district court ultimately granted this

3

motion, concluding that the jury tampering statute was unconstitutional as applied to Iannicelli and Brandt, and the People appealed.

¶4 A division of the court of appeals affirmed the dismissal orders, although it did so without reaching the constitutional question. The division concluded instead that, as properly interpreted, the jury tampering statute's prohibitions did not cover the conduct of which Iannicelli and Brandt were accused because that statute applies only to (1) "attempts to improperly influence jurors or those selected for a venire from which a jury in a particular case will be chosen" and (2) attempts to influence such a juror's "vote, opinion, decision, or other action in a specifically identifiable case." *People v. Iannicelli*, 2017 COA 150, ¶¶ 8, 31, __ P.3d __.

¶5 We now must determine whether the division properly interpreted the jury tampering statute.[1] Although we deem too narrow the division's conclusion that the statute prohibits only attempts to influence seated jurors or those selected for

---

[1] Specifically, we granted certiorari to consider:

1. Whether the jury tampering statute requires proof of an intent to influence a juror's vote, opinion, decision, or other action in a specifically identifiable case.

2. Whether the jury tampering statute implicitly modifies the definition of "juror" set forth in section 18-8-601, C.R.S. (2017).

a venire from which a jury in a particular case will be chosen, we agree with the division that the statute requires that a defendant's effort to influence a juror must be directed to a specifically identifiable case. Because the People did not charge Iannicelli and Brandt with such conduct, we affirm the division's judgment, although our reasoning differs in some respects from that of the division below.

## I. Facts and Procedural History

¶6 Iannicelli and Brandt went to the Lindsey-Flanigan Courthouse hoping to find jurors who were sitting on cases, in order to give them information about jury nullification. The People allege that Iannicelli and Brandt were on the plaza adjacent to the courthouse and that they asked people entering the courthouse whether they were jurors or potential jurors. If any of these people answered affirmatively, then Iannicelli and Brandt would give them one or more pamphlets concerning jury nullification.

¶7 An organization called the Fully Informed Jury Association produced the pamphlets that Iannicelli and Brandt distributed. As pertinent here, the pamphlets instructed jurors that "[j]uror nullification is your right to refuse to enforce bad laws and bad prosecutions." The pamphlets also contained a number of other statements and purported advice, including, among other things, the following:

- "Judges say the law is for them to decide. That's not true. When you are a juror, you have the right to decide both law and fact. American

5

jurors have a proud tradition of saying 'no' and 'not guilty' when bad and corrupt laws are used against people."

- "It is the responsibility of the jury to judge not just the facts of the case but also the law in question."

- "When you're questioned during jury selection, just say you don't keep track of political issues. Show an impartial attitude. Don't let the judge and prosecution stack the jury by removing all the thinking, honest people!"

- "[J]udges only rarely 'fully inform' jurors of their rights, especially their right to judge the law itself and vote on the verdict according to conscience."

- "The jury has the power to nullify any law . . . . [T]he jury has the power to ignore previous rulings by the Supreme Court and still find the defendant not guilty if they judge the law and previous court rulings to be wrong."

- "Instructions and oaths are designed to bully jurors and protect political power. Although it all sounds very official, instructions and oaths are not legally binding, or there would be no need for independent thinking jurors like you."

- "You cannot be forced to obey a 'juror's oath.'"

- "If the law violates any human rights, you *must vote no* against that law by voting 'not guilty.'"

¶8     A deputy district attorney observed Iannicelli and Brandt distributing these pamphlets and reported their activity to the police. The police arrived and arrested the two men, and the People charged them with multiple counts of jury tampering pursuant to section 18-8-609(1).

6

¶9 Iannicelli and Brandt subsequently moved to dismiss these charges. They argued, among other things, that (1) they had been engaging in speech protected by the First Amendment; (2) they had been doing so on the courthouse plaza, which, they asserted, is a designated public forum for free speech; and (3) section 18-8-609(1) was unconstitutionally overbroad in violation of the First Amendment. The People responded that the First Amendment did not cover the alleged conduct and that the State could adopt safeguards that were necessary and proper to ensure that the administration of justice at all stages was free from outside control and influence.

¶10 The district court ultimately granted Iannicelli and Brandt's motion. The court initially concluded that section 18-8-609(1) is not unconstitutional on its face because it serves the legitimate purpose of protecting the legal system, and particularly the jury trial process, from corruption. The court went on to conclude, however, that because Iannicelli and Brandt had been engaged in an activity that constituted speech and because they were engaged in this activity in a public place, the statute was unconstitutional as applied to them. The court therefore dismissed the charges.

¶11 The People appealed, and in a unanimous, published opinion, a division of the court of appeals affirmed. *Iannicelli*, ¶¶ 2, 32. In doing so, the division did not address the question of the statute's constitutionality. *Id.* at ¶ 8. Instead, the

7

division concluded that as properly interpreted, the statute's terms did not proscribe Iannicelli and Brandt's conduct. *Id.* at ¶¶ 8, 31.

¶12 As pertinent here, the division began by examining section 18-8-609(1)'s use of the words "juror" and "a case," as well as the definition of the word "juror" found in section 18-8-601(1), C.R.S. (2019), which includes persons who have merely been summoned for jury duty. *Id.* at ¶ 13. The division acknowledged that generally, when the legislature defines a statutory term such as "juror," that definition governs unless a contrary intention plainly appears. *Id.* at ¶ 14. The division perceived such a contrary intention here, based on the language of section 18-8-609(1). *Id.*

¶13 Specifically, the division noted first that the statute proscribes attempts to influence a juror in "a case" but that "[o]ne who has merely been summoned for jury duty is not serving in 'a case,' and indeed may ultimately not serve." *Id.* at ¶ 15. In contrast, a person who is serving as a juror or who has been selected for a venire from which a jury in a particular case will be chosen *is* serving in "a case." *Id.*

¶14 The division next pointed out that in the same sentence as the reference to "a case," "the General Assembly limited prohibited communications to those 'other than as a part of the proceedings *in the trial of the case*.'" *Id.* at ¶ 16 (quoting section 18-8-609(1)). The division explained, "In twice using the definite article

8

'the,' the General Assembly intended to limit the statute's reach to conduct relating to a trial of a particular case." *Id.*

¶15 Lastly, the division observed that although the defendant must intend to influence a juror's action in a case, a person who has merely been summoned for jury duty and who sits in a room waiting to be called is in no position to take action in any case. *Id.* at ¶ 17.

¶16 Read together, the foregoing observations convinced the division that section 18-8-609(1) limits prosecution to attempts to influence persons who have been chosen as jurors or who have been selected as part of a venire from which a jury in a particular case will be chosen. *Id.* at ¶ 24. Even if the statute could be said to be ambiguous, however, the division opined that the result would be the same. *Id.* at ¶¶ 25, 30. In the division's view, were a court to construe the statute as applying to communications with summoned jurors about matters unrelated to a particular case, "there [would be] a real danger the statute could encroach on a substantial amount of protected speech." *Id.* at ¶ 25. Under settled principles of statutory construction, the division construed the statute as it did to avoid that result. *Id.* at ¶¶ 25, 30.

¶17 The People then petitioned for certiorari, and we granted their petition.

## II. Analysis

¶18    We begin by discussing the applicable standard of review. We then consider the language of sections 18-8-601 and 18-8-609, and although we agree with the People that the division's construction of the term "juror" was too narrow, we ultimately agree with the division's conclusion that the statute's reach is limited to those who attempt to influence a juror in a specific, identifiable case. Because the People did not charge Iannicelli and Brandt with having done so, we conclude that the trial court properly dismissed the charges at issue.

### A. Standard of Review

¶19    We review issues of statutory interpretation de novo. *Doubleday v. People*, 2016 CO 3, ¶ 19, 364 P.3d 193, 196. In construing a statute, our primary purpose is to ascertain and give effect to the legislature's intent. *Id.* To do so, we look first to the language of the statute, giving its words and phrases their plain and ordinary meanings. *Id.* We read statutory words and phrases in context, and we construe them according to the rules of grammar and common usage. *Id.*

¶20    We must also endeavor to effectuate the purpose of the legislative scheme. *Id.* at ¶ 20, 364 P.3d at 196. In doing so, we read that scheme as a whole, giving consistent, harmonious, and sensible effect to all of its parts. *Id.* We must avoid constructions that would render any words or phrases superfluous or that would lead to illogical or absurd results. *Id.*

10

¶21    If the statute is unambiguous, then we need look no further. *Id.* If, however, the statute is ambiguous, then we may consider other aids to statutory construction, including the consequences of a given construction, the end to be achieved by the statute, and the statute's legislative history. *Bostelman v. People*, 162 P.3d 686, 690 (Colo. 2007). A statute is ambiguous when it is reasonably susceptible of multiple interpretations. *Hunsaker v. People*, 2015 CO 46, ¶ 11, 351 P.3d 388, 391.

¶22    Finally, "statutory terms should be construed in a manner that avoids constitutional infirmities. Thus, if a statute is capable of alternative constructions, one of which is constitutional, then the constitutional interpretation must be adopted." *People v. Zapotocky*, 869 P.2d 1234, 1240 (Colo. 1994) (citations omitted).

## B. Section 18-8-609(1)

¶23    Section 18-8-609(1) provides, "A person commits jury-tampering if, with intent to influence a juror's vote, opinion, decision, or other action in a case, he attempts directly or indirectly to communicate with a juror other than as a part of the proceedings in the trial of the case."

¶24    Section 18-8-601(1), in turn, defines "juror" as

> any person who is a member of any jury or grand jury impaneled by any court of this state or by any public servant authorized by law to impanel a jury. The term "juror" also includes any person who has been drawn or summoned to attend as a prospective juror.

11

¶25 The People contend that the division erred in concluding that section 18-8-609(1) proscribes only attempts to (1) improperly influence impaneled jurors or those selected for a venire from which a jury in a particular case will be chosen and (2) influence those jurors relating to the trial of a particular case. In the People's view, the statutory definition of "juror" governs and, even in the absence of such a definition, the underlying purpose of section 18-8-609(1) would dictate that "juror" includes those summoned for jury service. The People further argue that the statute does not require proof that a defendant intends to influence actions in a specific, identifiable case but rather requires only an intent to influence *any* actual, extant case that has been scheduled for trial and for which the juror has been impaneled, selected for a venire, or summoned for service. We agree with the People's first point, but we are unpersuaded by their second.

¶26 As noted above, if a statute is susceptible of alternate constructions, one of which is constitutional and the other of which is not, then we must adopt the constitutional construction. *Zapotocky*, 869 P.2d at 1240. Accordingly, we begin our analysis of section 18-8-609(1)'s construction by briefly setting forth the constitutional principles that underlie the parties' dispute before us.

## 1. Constitutional Principles

¶27 "The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and

wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). To this end, our Supreme Court has observed that "'handing out leaflets in the advocacy of a politically controversial viewpoint . . . is the essence of First Amendment expression'; '[n]o form of speech is entitled to greater constitutional protection.'" *McCullen v. Coakley*, 573 U.S. 464, 488–89 (2014) (quoting *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995)). This is the type of conduct in which Iannicelli and Brandt were engaged here.

¶28 The foregoing principles apply with no less force to speech concerning judicial proceedings, which are public events. *See Craig v. Harney*, 331 U.S. 367, 374 (1947) ("A trial is a public event. What transpires in the court room is public property.").

¶29 Speech concerning judicial proceedings is not without limits, however, because like free speech, a fair trial is one "of the most cherished policies of our civilization" and must also be protected. *Bridges v. California*, 314 U.S. 252, 260 (1941); *see also United States v. Heicklen*, 858 F. Supp. 2d 256, 274 (S.D.N.Y. 2012) ("The relevant cases establish that the First Amendment squarely protects speech concerning judicial proceedings and public debate regarding the functioning of the judicial system, so long as that speech does not interfere with the fair and impartial administration of justice."). Accordingly, the Supreme Court has long recognized that states "may adopt safeguards necessary and appropriate to assure

13

that the administration of justice at all stages is free from outside control and influence." *Cox v. Louisiana*, 379 U.S. 559, 562 (1965).

¶30 Against this background of potentially competing constitutional principles, we turn to the question of statutory construction now before us.

## 2. A "Juror"

¶31 We first consider the People's contention that the division erred in concluding that, for purposes of section 18-8-609(1), jurors are limited to "persons who have been chosen as jurors or who have been selected as part of a venire from which a jury in a particular case will be chosen." *Iannicelli*, ¶ 24.

¶32 As noted above, section 18-8-601(1) defines "juror" as a person who "is a member of any jury or grand jury impaneled by any court of this state or by any public servant authorized by law to impanel a jury. The term 'juror' also includes any person who has been drawn or summoned to attend as a prospective juror." The criminal code makes clear that this definition applies to section 18-8-609(1), unless the definition is specifically limited or the context indicates that it is inapplicable. *See* § 18-1-901(1), C.R.S. (2019) ("Definitions set forth in any section of this title apply whenever the same term is used in the same sense in another section of this title unless the definition is specifically limited or the context indicates that it is inapplicable."); *see also Farmers Ins. Exch. v. Bill Boom Inc.*, 961 P.2d 465, 470 (Colo. 1998) (noting that "when the legislature defines a term in

14

a statute, that definition governs" and that it governs "wherever [the term] appears in the statute, except where a contrary intention plainly appears").

¶33    We perceive nothing in the statutory definition of "juror" (or in section 18-8-609(1)) that specifically limits the definition's applicability here.  Nor do we perceive anything in the jury tampering statute to suggest that section 18-8-601(1)'s definition of "juror" is inapplicable in the context of alleged jury tampering.  Accordingly, we conclude that the division's definition of "juror," which excluded jurors who had merely been summoned to attend as prospective jurors, was erroneous.

¶34    In reaching this conclusion, we are not persuaded by the division's determination that the language of section 18-8-609(1) plainly suggests a legislative intention not to apply section 18-8-601(1)'s definition of "juror" in the context of alleged jury tampering.  Although, as we understand it, the division believed that the statutory language "a case" and "the case" would only make sense if the term "juror" were confined to persons who have been chosen as jurors or who have been selected as part of a venire from which a jury in a particular case will be chosen, it is not clear to us why this is so, much less plainly so.  For example, we do not perceive why the jury tampering statute would not apply to a scenario in which an individual approaches a woman who has been summoned for one of a number of cases set for trial on a particular day and tells her that if she is selected

for the jury in a specific case, then she had better vote to acquit the defendant or else harm would befall her or her family. *Cf. Nobles v. State*, 769 So. 2d 1063, 1064 (Fla. Dist. Ct. App. 2000) (affirming the defendant's jury tampering conviction when, in preparation for trial on drug charges, the defendant obtained a list of the prospective jurors in his case and, recognizing the name of one of these prospective jurors, asked her to "do him a favor [and] say that she did not know him and, if selected on the jury, to vote to find him not guilty," telling her that "it would be in her best interest to do as he had asked").

¶35    Nor are we persuaded that applying section 18-8-601(1)'s definition of "juror" in the context of the jury tampering statute (i.e., to include summoned jurors who were not yet selected for a jury or assigned to a venire for a particular case) could encroach on a substantial amount of protected speech. *Iannicelli*, ¶ 25. Indeed, on the facts of this case, we perceive no constitutional infirmity arising from the statutory definition of the word "juror," particularly when that definition is read together with the remaining requirements of section 18-8-609(1), including the requirement of an intent to influence a juror's vote, opinion, decision, or other action in "a case," which we discuss more fully below.

¶36    Accordingly, we conclude that for purposes of section 18-8-609(1), a "juror" is defined as set forth in section 18-8-601(1). The question thus becomes whether the division erred in concluding that section 18-8-609(1) applies only to attempts

16

to influence jurors with regard to a specific, identifiable case.  We turn next to that question.

### 3.  A "Case"

¶37	In the People's view, the division erred in concluding that section 18-8-609(1) applies only to attempts to influence jurors with regard to a specific, identifiable case because (1) the word "the," on which the division relied in construing the statute, does not always convey a sense of limitation but rather can also mean "a"; and (2) the word "the," as it is used in the statute, does not appear in the language describing the offense's mental state element but rather appears only in a prepositional phrase modifying the exception to the statute's actus reus.  Thus, the People contend, to the extent the General Assembly intended to include any specific-case limitation, it did so only with respect to the exception.  We are not persuaded.

¶38	As noted above, section 18-8-609(1) provides that a person commits jury tampering if, with the intent to influence a juror's vote or other action "in *a case*," he or she attempts to communicate with a juror, other than as part of the proceedings in the trial "of *the case*."  (Emphases added.)  The word "the" is a definite article, and it particularizes the word that it precedes.  *See Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019) ("[G]rammar and usage establish that 'the' is 'a function word . . . indicat[ing] that a following noun or noun equivalent is definite or has

17

been previously specified by context.'") (second alteration in original) (quoting Merriam-Webster's Collegiate Dictionary 1294 (11th ed. 2005)). Accordingly, "the case" describes a specific case. The question thus becomes what case this language references. We view the answer to this question as self-evident because the statute refers to just one "case," namely, the case to which the actor's efforts to influence a juror are directed. *See People v. Enlow*, 310 P.2d 539, 546 (Colo. 1957) (noting that the state constitution's definition of a felony as "an 'offense punishable by death or imprisonment in the penitentiary,'" did not mean "*a* penitentiary or *any* penitentiary; it means *the* penitentiary of this state.") (quoting Colo. Const. art. XVIII, § 4).

¶39 Stated another way, the words "a case" introduce a particular case to which the actor's efforts to influence a juror are directed, and the words "the case," which appear later in the same sentence, refer back to the case that had been introduced earlier.

¶40 For these reasons, we conclude that section 18-8-609(1) refers to one particular case, namely, the specific case to which the actor's efforts to influence a juror are directed.

¶41 In *Turney v. State*, 936 P.2d 533, 540–41 (Alaska 1997), the Alaska Supreme Court reached the same conclusion in interpreting a similar jury tampering statute.

18

¶42 In *Turney*, the defendant, Turney, was a friend of a man named Hall, who was on trial on charges of being a felon in possession of a concealable weapon. *Id.* at 536. During Hall's trial, Turney was in the courthouse promoting his views of the jury system through, among other things, signs and leaflets, and he also publicized the telephone number of the Fully Informed Jury Association, the same organization that produced the jury nullification pamphlets at issue in the present case. *Id.* As pertinent here, Turney initially contacted several jurors who were summoned for jury duty in the Hall case, and, after the trial began, he contacted three jurors who were then serving on the jury. *Id.* at 536–37. With the apparent intention of influencing these jurors' actions in his friend Hall's case, Turney asked each of these jurors to call the Fully Informed Jury Association's telephone number because he wanted them to know what their rights were, and at least one of the sitting jurors called that number. *Id.* Thereafter, this juror told other jurors that he had done so, and based on what he had learned, he was changing his prior "guilty" vote to "not guilty." *Id.* at 537. As a result of this juror's changed vote and that of another juror who also changed his or her vote after speaking with Turney or calling the number, the jury hung. *Id.*

¶43 Based on these facts, Turney was charged with jury tampering under Alaska Statute section 11.56.590 (2019). *Turney*, 936 P.2d at 535. That statute, like the Colorado statute at issue in the present case, prohibits a person from engaging in

19

jury tampering by "directly or indirectly communicat[ing] with a juror other than as permitted by the rules governing the official proceeding with intent to (1) influence the juror's vote, opinion, decision, or other action as a juror; or (2) otherwise affect the outcome of the official proceeding." § 11.56.590(a). As Iannicelli and Brandt did here, Turney challenged this statute as unconstitutionally overbroad or void for vagueness. *Turney*, 936 P.2d at 535.

¶44 The court ultimately rejected Turney's contentions. *Id.* at 540–41. In doing so, the court observed that the statute reaches communications made with the intent to "otherwise affect the outcome of the official proceeding." *Id.* at 540. In the court's view, this language made clear that the statute was directed at "the" official proceeding, and particularly at communications intended to affect how the jury decides a specific case, namely, "the" official proceeding. *Id.* The court opined that such a construction would properly avoid any constitutionality concerns because it would proscribe only speech intended to influence a juror in his or her capacity as a juror in a particular case, which conduct was not protected by the First Amendment. *Id.* at 541.

¶45 In our view, the Alaska Supreme Court's analysis mirrors our own analysis of Colorado's similarly worded jury tampering statute, and for the reasons set forth in *Turney*, as well as those set forth above, we conclude that section

20

18-8-609(1)'s prohibition against jury tampering is limited to attempts to influence a person's vote, opinion, decision, or other action in a specifically identifiable case.

¶46 In reaching this conclusion, we are not persuaded by the People's argument that "a case" refers to any existing case and that "the case" is solely part of the statutory exception (i.e., the language that states, "other than as a part of the proceedings in the trial of the case").

¶47 As an initial matter, we perceive no basis to assign two different meanings to the word "case," as that term is used in section 18–8–609(1). *See Przekurat by & through Przekurat v. Torres*, 2018 CO 69, ¶ 8, 428 P.3d 512, 514 ("Where the legislature has used the 'same words or phrases in different parts of a statute,' we ascribe a consistent meaning to those words unless there is a 'manifest indication to the contrary.'") (quoting *Colo. Common Cause v. Meyer*, 758 P.2d 153, 161 (Colo. 1988)). Nor can we discern how the words "a case" can mean "any existing case" while "the case," which is used in the very same sentence, can refer to something else. In addition, as a matter of grammar and common usage, the words "the case" must refer back to something, and although the People suggest that these words describe a case referenced in the statutory exception, the exception does not refer to any such case. Accordingly, under the People's reading, "the case" has no apparent antecedent, and the word "the" has no meaning. We cannot, however,

21

interpret statutory language in such a way as to render any of the statute's terms meaningless. *Doubleday*, ¶ 20, 364 P.3d at 196.

¶48     Even were we to agree with the People's construction of the statute, however, that construction would suggest, at best, that the statute is reasonably susceptible of multiple interpretations and therefore is ambiguous.  But such a determination would not assist the People here because were we to perceive ambiguity, we would still be compelled to reject the People's proposed construction because that construction would result in a number of constitutional infirmities. *See Zapotocky*, 869 P.2d at 1240.  For example, the People's construction would likely criminalize a significant amount of speech that appears to be protected, including, for example, a post about jury nullification on a message board about jury duty, an op-ed in a local newspaper expressly encouraging jurors or prospective jurors to refuse to convict a defendant if they felt that the state had crossed the line in a particular case, or an anti-death penalty protest in front of a courthouse while a capital case was proceeding.

¶49     Nor do we agree with the People's argument that our interpretation would permit an individual to walk into a jury assembly room to lecture the prospective jurors generally about the evils of the war on drugs and to urge acquittal in all prosecutions involving controlled substances.  "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their

22

right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799–800 (1985); *see also Curious Theatre Co. v. Colo. Dep't of Pub. Health & Env't*, 220 P.3d 544, 546 (Colo. 2009) (noting that, First Amendment protections notwithstanding, expression is subject to reasonable time, place, or manner restrictions and that such restrictions are valid if they are justified without reference to the content of the regulated speech, are narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communication of the information). Under our construction of section 18-8-609(1), it may be that the hypothetical posed by the People would not support a jury tampering conviction (although, depending on the facts, it could). For the reasons set forth above, however, this does not mean that the State is powerless to prohibit the conduct about which the People are concerned or that an individual would necessarily be permitted to engage in the conduct that the People describe.

23

¶50 For all of the foregoing reasons, we conclude that section 18-8-609(1)'s prohibition extends only to attempts to communicate with jurors about a specifically identifiable case.[2]

¶51 The question remains whether the People sufficiently alleged that Iannicelli and Brandt engaged in such conduct here. We conclude that the People did not do so. According to the People's allegations, Iannicelli and Brandt never asked individuals entering the courthouse whether they were serving on a specific jury. They only asked generally whether those entering the building were reporting for jury duty (e.g., they apparently asked, "Are you here for jury duty?" or "Are you a juror?"). If any of such persons responded affirmatively, then Iannicelli and Brandt would give them one or more pamphlets discussing the concept of jury nullification. At no time did Iannicelli or Brandt attempt to discuss a particular case with any of the jurors they met, nor did their literature address any specific,

---

[2] This does not mean, however, that the defendant must specifically identify the case. A defendant can certainly intend to influence jurors in a specifically identifiable case without identifying the case (for example, by case name or number). We frame our holding as we do to track the language of the statute and to distinguish the scenario in which a speaker intends to communicate a viewpoint to any and all possible jurors generally from that in which the speaker, intending to influence a juror's action in a specifically identifiable case, communicates with that juror. The latter squarely falls within the jury tampering statute. The former does not, and concluding otherwise would raise substantial constitutional concerns.

identifiable case. Indeed, Iannicelli and Brandt do not appear to have been concerned with any particular case. Rather, their sole motive appears to have been to provide information about jury nullification generally.

¶52 On these facts, and based on our above-described construction of section 18-8-609(1), such conduct does not suffice to support a conviction for jury tampering. Accordingly, we conclude that the district court properly dismissed the jury tampering charges against Iannicelli and Brandt.[3]

## III. Conclusion

¶53 For these reasons, we conclude that for purposes of Colorado's jury tampering statute, section 18-8-609(1), a juror is any person who is either a member of a jury or a grand jury or any person who has been drawn or summoned to attend as a prospective juror. We further conclude that to commit jury tampering under that statute, a person must attempt to communicate with a juror, directly or indirectly, with the intent to influence that juror's vote, opinion, decision, or other action in a specifically identifiable case. Here, because the People did not allege

---

[3] In reaching this conclusion, we acknowledge that defining the precise scope of section 18-8-609(1) presents complex questions as to both First Amendment rights and the State's interest in ensuring the fair and orderly administration of justice. The facts of this case, however, do not require us to attempt to craft an all-encompassing rule applicable in every factual scenario. Accordingly, we leave that difficult task for another day.

that Iannicelli and Brandt engaged in such conduct, we conclude that the district court properly dismissed the jury tampering charges against them.  Accordingly, we affirm the division's judgment upholding the district court's dismissal orders, although our reasoning differs in some respects from that of the division below.

**JUSTICE SAMOUR** dissents, and **CHIEF JUSTICE COATS** joins in the dissent.

JUSTICE SAMOUR, dissenting.

¶54    Trial by jury is a bedrock of our justice system and, by extension, of our democracy. Of course, this is hardly a revelation. Our founding fathers recognized the indispensable role of trial by jury. Thomas Jefferson proclaimed that he considered trial by jury "as the only anchor ever yet imagined by man, by which a government can be held to the principles of its constitution." 3 *The Writings of Thomas Jefferson* 71 (Washington ed. 1861). And Alexander Hamilton declared that, whatever differences existed between the friends and adversaries of the convention, they agreed on "the value they set upon the trial by jury," and, to the extent their views on this topic were not aligned, the disagreement consisted of "the former regard[ing] it as [a] valuable safeguard to liberty" and "the latter represent[ing] it as the very palladium of free government." *The Federalist No. 83*, at 491, 499 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

¶55    The U.S. Supreme Court has echoed our forefathers' sentiments. In *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935), it observed that "[m]aintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *See also City of Morgantown v. Royal Ins. Co.*, 337 U.S. 254, 258 (1949) ("Trial by jury is a vital and cherished right, integral in our judicial system."). Much more recently, it reminded us (in a Colorado criminal

1

case no less) that trial by jury is one of the foundational pillars of our system of justice and central to the rule of law and our form of government:

> Whatever its imperfections in a particular case, *the jury is a necessary check on governmental power*. The jury, over the centuries, has been an inspired, trusted, and effective instrument for resolving factual disputes and determining ultimate questions of guilt or innocence in criminal cases. *Over the long course its judgments find acceptance in the community, an acceptance essential to respect for the rule of law*. The jury is a tangible implementation of the principle that the law comes from the people.

*Peña-Rodriguez v. Colorado*, 137 S. Ct. 855, 860 (2017) (emphases added).

¶56    Yet, today, the majority concludes that our jury tampering statute countenances conduct admittedly aimed at nullifying jury verdicts. Such conduct at once threatens the integrity of judicial proceedings and undermines the public's trust in the justice system. The integrity of legal proceedings, including with respect to jury trials in general and jury verdicts in particular, is of seminal importance because the public's confidence in our justice system rests squarely on the belief that jurors act fairly and impartially in reaching their decisions. When, as alleged here, individuals compromise that belief by unabashedly influencing jurors outside the courtroom, it risks the erosion of the public's confidence in court proceedings. And, because our justice system cannot thrive without the public's trust, legislatures guard against the type of conduct alleged here. *Cf. Cox v. Louisiana*, 379 U.S. 559, 560, 562 (1965) (explaining that a statute prohibiting picketing directed at "influencing any judge, juror, witness, or court officer, in the

2

discharge of his duty" was an important safeguard "to vindicate the State's interest in assuring justice under law"); *People v. Zupancic*, 557 P.2d 1195, 1196 (Colo. 1976) ("Jurors and witnesses should be protected vigorously from outside influences.  Any attempt to corrupt, influence, or tamper with the administration of justice has been condemned and proscribed by the legislature.") (citation omitted).

¶57    Because Iannicelli's and Brandt's alleged acts are criminal under a plain reading of Colorado's jury tampering statute, § 18-8-609(1), C.R.S. (2019), and constitute an assault on our system of justice, the rule of law, and our democracy, I respectfully dissent.

## I.  Analysis

¶58    I begin by interpreting the language of the jury tampering statute.  After demonstrating that the majority misses the mark in its textual analysis, I briefly discuss the First Amendment concerns raised by the parties and the majority.

## A.  The Jury Tampering Statute

¶59    The jury tampering statute, section 18-8-609(1), provides:

> A person commits jury-tampering if, with intent to influence *a juror's* vote, opinion, decision, or other action in *a case*, he attempts directly or indirectly to communicate with *a juror* other than as a part of the proceedings in the trial of the case.

3

(emphases added). The issues we agreed to review revolve around the interpretation of two terms in this statute: "juror" and "a case." I agree with the majority's construction of the former, but not the latter. I address each in turn.

## 1. "Juror"

¶60 I commend the majority for recognizing that the division erred in finding that "juror," as used in section 18-8-609(1), is limited to a "person[] who ha[s] been chosen as [a] juror[] or who ha[s] been selected as part of a venire from which a jury in a particular case will be chosen." Maj. op. ¶ 31 (quoting *People v. Iannicelli*, 2017 COA 150, ¶ 24, __ P.3d __). In defining "juror," the legislature expressly indicated that the term also includes a person who has been summoned for jury duty but who has not yet been selected to serve on a jury or as part of a venire in a particular case:

> "Juror" means any person who is a member of any jury or grand jury impaneled by any court of this state or by any public servant authorized by law to impanel a jury. *The term "juror" also includes any person who has been drawn or summoned to attend as a prospective juror.*

§ 18-8-601(1), C.R.S. (2019) (emphasis added). For the reasons articulated by the majority, the division mistakenly determined that the legislature did not intend for this definition to apply in the jury tampering context. *See* Maj. op. ¶¶ 32–33.

¶61 Thus, like the majority, I understand "juror" in the jury tampering statute to cover: (1) any person selected to serve on a jury in the trial of a case; (2) any person selected to be on a venire from which the jury in the trial of a case will be chosen;

4

and (3) any person who has been drawn or summoned to appear as a prospective juror, but who has not yet been selected to be on a jury in the trial of a case or on a venire from which the jury in the trial of a case will be chosen (hereinafter "prospective juror"). Where I part ways with my colleagues in the majority is in their interpretation of "a case." I analyze that aspect of the jury tampering statute next.

## 2. "A case"

¶62 Section 18-8-609(1) provides that, to be guilty of jury tampering, a defendant must act with intent to influence a juror's vote, opinion, decision, or other action in "a case." While the majority and I are on the same page on the definition of "juror," we do not see eye-to-eye on the meaning of "a case." But our disagreement is narrower than appears at first glance because there is no dispute about what "a case" refers to when the first two of the three categories of "juror" are implicated. After all, once a person has been selected to serve on a jury in the trial of a case or to be on a venire from which the jury in the trial of a case will be chosen, there is only one case of relevance. Whatever case the person has been selected in (either as a seated juror or as a venire member) is the case to which "a case" refers. The question is trickier, though, when it comes to the third category of "juror" because a prospective juror has merely been summoned to appear for jury service and has not yet been assigned to a particular case (either as a seated

5

juror or as a venire member). The majority's analysis goes awry because it fails to discern that, unlike a seated juror and a venire juror, a prospective juror is vulnerable to being influenced in any of the cases set for jury trial for which she has been summoned to appear.

¶63 Given the reality surrounding prospective jurors, the legislature wisely defined the offense of jury tampering broadly, making it a crime to communicate or attempt to communicate with a prospective juror with the intent to influence her vote, opinion, decision, or other action in "a case." I cannot join the majority in its untenable conclusion that "a case" circumscribes the statute's prohibited conduct to communications or attempted communications about *a specifically identifiable case*.

¶64 Notably, there are times when, unbeknownst to the public, citizens are summoned to appear as prospective jurors for a single case (for example, a first-degree murder case or a high profile case). In that situation, there would be a "specifically identifiable case." Consequently, under the majority's analysis, the charges against Iannicelli and Brandt would have survived if it had turned out that only one case was scheduled for trial on the date of offense. In other words, the majority hinges jury tampering liability in the context of prospective jurors on chance—depending on whether it is later discovered that a single case or multiple

6

cases were scheduled for trial on the date of the alleged conduct. I find it difficult to believe that this is what our legislature intended.

¶65 Based on the majority's reading of the jury tampering statute, no crime will have been committed if an individual approaches a woman who has been summoned for one of a number of cases set for jury trial on a particular day and tells her that if she is selected to be a juror, then she had better vote "not guilty" or else harm will befall her or her family. Indeed, this conduct is not dissimilar to Iannicelli's and Brandt's, which the majority says does not amount to jury tampering. In the event a jury tampering charge is brought against the individual in this example, he would have a surefire defense: He did not intend to influence any prospective juror's vote, opinion, decision, or other action in a specifically identifiable case because it was later discovered that there were multiple cases set for jury trial that day. Even if, as a result of eleventh-hour dispositions, only one case actually proceeds to trial that day, the individual still will not have committed jury tampering according to the majority. Nor would the subsequent selection of the woman to serve on the jury in that case be of consequence for the majority.

¶66 The majority's reasoning seems counterintuitive. If, in communicating with a prospective juror, a defendant intends to influence a case that is specifically identifiable because it is the only case set for jury trial, he may be charged with jury tampering. But if there is more than one case set for jury trial and he intends

7

to influence either multiple cases or a single case he shrewdly or inadvertently omits identifying, then no crime has occurred and no charges may be brought. In each of these scenarios, the defendant has attempted to influence the outcome of a case, but based essentially on semantics, the majority would hold the defendant liable only in the first scenario.

¶67 In justifying its form-over-substance position, the majority hangs its hat on the exception in section 18-8-609(1), which unremarkably provides that it is not jury tampering if a person communicates or attempts to communicate with a juror "as a part of the proceedings in the trial of the case." The exception ensures that someone, such as an attorney, will not be accused of jury tampering when she properly attempts to influence a juror's vote, opinion, decision, or other action as part of trial proceedings. Because the exception uses "the case" instead of "a case," however, the majority infers that the legislature must have meant the earlier reference to "a case" to mean "the case." Maj. op. ¶ 38. Stated differently, the majority equates "a case" with "the case." And in considering what case "the case" refers to, including in the context of a prospective juror, the majority pronounces that the answer is "self-evident," though it resorts to circular reasoning to support that self-serving characterization:

> The word "'the case' describes a specific case," which must mean "the case to which the actor's efforts to influence a juror are directed" because the statute refers to "the case"; and "the words 'the case' . . . refer back to" "the words 'a case,'" which "introduce a

8

particular case to which the actor's efforts to influence a juror are directed."

*Id.* at ¶¶ 38–39.

¶68     In my view, no mental gymnastics are necessary.  The term "a case" evinces the legislature's intent to refer to *any case* and to include *multiple cases*.  *See, e.g.*, *Brooks v. Zabka*, 450 P.2d 653, 655 (Colo. 1969) (rejecting defendants' claim that the phrase "the tax levy" in a city charter referred to "[a]ny tax levy," instead of "the property tax mill levy," and citing the well-established "rule of law" that the definite article "the" "is a word of limitation as opposed to the indefinite or generalizing force of 'a' or 'an'"); *Cerbo v. Protect Colo. Jobs, Inc.*, 240 P.3d 495, 501 (Colo. App. 2010) (explaining that "by using the indefinite article 'a,' the phrase 'a major purpose'" in a constitutional amendment brought "within its ambit organizations for which promoting a ballot issue [was] but one major purpose"); *see also Colorado v. Sunocco, Inc.*, 337 F.3d 1233, 1241 (10th Cir. 2003) ("If Congress intended to allow multiple actions for separate components of recovery or remedy, it surely would have used the indefinite article 'a' rather than the definite article 'the' to modify the phrases 'removal action' and 'remedial action.'").

¶69     Hence, giving the words "a case" their plain and ordinary meaning, *see Cowen v. People*, 2018 CO 96, ¶ 14, 431 P.3d 215, 218, and effectuating all parts of the statute in harmony with the overall statutory design, *see id.* at ¶ 13, I generally agree with the People that section 18-8-609(1) makes it unlawful for an individual

9

to communicate or attempt to communicate with a prospective juror with the intent to influence that prospective juror's vote, opinion, decision, or other action in: (1) an actual, existing case or actual, existing cases; (2) scheduled for jury trial; and (3) as to which the prospective juror has been summoned for jury service. Had the legislature intended to prohibit jury tampering only when a case is specifically identifiable, it presumably would have said so. *See, e.g.*, *People v. Diaz*, 2015 CO 28, ¶ 12, 347 P.3d 621, 624 ("We do not add words to the statute or subtract words from it." (quoting *Turbyne v. People*, 151 P.3d 563, 567 (Colo. 2007))). Because the legislature chose to refer to "a case," instead, I would conclude that there is no basis to require proof that the defendant intended to influence a specifically identifiable case.

¶70　It is true that section 18-8-609(1) refers to "the case" after initially referring to "a case." But the majority can find no refuge in "the case." I do not take issue with the majority's observation that "the" is a definite article that particularizes the word it precedes, here "case." Nor do I pick a bone with the majority's conclusion that "'the case' describes a specific case." Maj. op. ¶ 38. Where the majority and I are at variance is in its decision to treat "a case" and "the case" as synonyms. The flaw in the majority's rationale lies in its failure to recognize that the statute uses "a case" to define *the offense* and "the case" to modify only *the exception to the offense*. It follows that, while "the case" connotes a specific-case

10

limitation, that limitation applies only to the exception. That the legislature intended the exception to the offense to be narrower than the offense makes logical sense. By definition, an exception to an offense must be narrower than the offense itself.

¶71 More importantly, the majority fails to apprehend that, unlike the elements of the offense, which refer to "a case" in general, the exception refers more specifically to "the proceedings *in the trial of the case*." § 18-8-609(1) (emphasis added). The exception refers to "the case" (a specific case) because it applies only *once trial has started*. At that point, there is only one case. Therefore, it is not surprising that the legislature chose to use "the case," not "a case," in setting forth the exception. In stark contrast, the offense applies to any case and is not limited to the trial stage of a case. The reason is simple: Based on the definition of "juror," the offense broadly includes communications and attempted communications with an individual who has been summoned for jury service but who has not yet been assigned to a specific case, never mind to a specific case after trial proceedings have commenced.

¶72 In the end, I cannot in good conscience endorse the majority's approach. In particular, I find it troubling that, as it relates to prospective jurors, today's holding improperly shrinks the scope of the jury tampering statute nearly to the point of extinction. But not only does today's decision shield from prosecution almost all

tampering involving a prospective juror, it also inadvertently disseminates the blueprint for how to tamper with a prospective juror and get away with it: Make sure more than one case is set for jury trial and avoid identifying a specific case.

¶73     Armed with today's decision, any individual—including a party or a party's relative, friend, or agent—may follow in Iannicelli's and Brandt's footsteps, show up to a courthouse on the day a case of interest is one of multiple cases set for jury trial, and lawfully urge any or all of the prospective jurors summoned for jury service to vote "guilty," "not guilty," "liable," "not liable," "for the defense," or "for the plaintiff and the prosecution" in the cases set for jury trial that day.  Even assuming law enforcement later digs up evidence that links such an individual to one of the cases set for trial that day and establishes an interest in that case's outcome, I question whether the prosecution could prove a charge of jury tampering because it would have difficulty showing that he intended to influence only that particular case.  Whatever his true motive, his communication directed broadly at no case in particular would serve as irrebuttable proof that he intended to influence multiple cases, not a single identifiable case.  And that would suffice to escape liability.

¶74     Significantly, the majority appears to realize the magnitude of today's decision.  But, simultaneous with handcuffing the People's ability to charge the likes of Iannicelli and Brandt with jury tampering in order to protect the integrity

12

of judicial proceedings and to foster the public's trust in our justice system, it brushes off the adverse impact of its opinion, swiftly discounting the compelling concerns raised by the People. Maj. op. ¶ 49. The Government is "not powerless," proclaims the majority, speculating that there must be other measures it can take to ward off the alleged conduct in question. *Id.* Tellingly, though, the majority stops short of providing a specific, practical remedy. *Id.* And I'm aware of none.

¶75 In sum, I agree with the majority's interpretation of "juror," but I strongly disagree with its reading of "a case." Because the majority gives "a case" an overly narrow and unsupportable construction and, in the process, turns a blind eye to a distressing situation, I cannot concur in its opinion.

## B. Constitutional Concerns

¶76 As I mentioned earlier, we agreed to review two specific questions related to the meaning of "juror" and "a case" in the jury tampering statute. There are not competing interpretations that are textually supportable for either term because neither term is ambiguous. Instead, as I have demonstrated, applying time-honored rules of statutory interpretation, there is only one way to construe each term. Therefore, I do not believe it is appropriate to invoke the canon of constitutional doubt. *See High Gear & Toke Shop v. Beacom*, 689 P.2d 624, 632 (Colo. 1984) (stating that the canon of constitutional doubt assists a court in choosing among competing interpretations that are textually supportable when one of those

13

interpretations would raise serious doubts about the constitutionality of the statute); *see also Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 212 (1998) (indicating that the constitutional doubt canon is applicable where a statute is susceptible to two constructions, not where it is unambiguous).[1]

¶77    The majority nevertheless surmises, as do Iannicelli and Brandt, that the People's interpretation of "a case" would yield "a number of constitutional infirmities."  Maj. op. ¶ 48.  More specifically, the majority asserts that such an interpretation would bring within the purview of the jury tampering statute protected speech, including "a post about jury nullification on a message board about jury duty, an op-ed in a local newspaper expressly encouraging jurors or prospective jurors to refuse to convict a defendant . . . , or an anti-death penalty protest in front of a courthouse while a capital case [is] proceeding."  *Id.*  The People respond that those concerns are not valid because the statute implicitly

---

[1] The canon of constitutional doubt is sometimes incorrectly referred to as the canon of "constitutional avoidance."  *United States v. Davis*, 139 S. Ct. 2319, 2332 n.6 (2019).  There are actually at least two canons of construction that are sometimes referred to as "constitutional avoidance": one, "perhaps better termed the presumption of constitutionality," directs courts, where possible, to "interpret ambiguous statutes to avoid rendering them unconstitutional"; the other, the more modern and more debated canon, is the "constitutional doubt canon," which suggests that "courts should construe ambiguous statutes to avoid the need even to address serious questions about their constitutionality."  *Id.*

requires proof that the actor *knowingly* communicated or attempted to communicate with someone who is a juror, *see* § 18-1-503(2), C.R.S. (2019) ("Although no culpable mental state is expressly designated . . . a culpable mental state may nevertheless be required . . . if the proscribed conduct necessarily involves such a culpable mental state."), and explicitly requires proof that the actor communicated or attempted to communicate *with the individual he knew to be a juror with the specific intent* to influence the outcome of a case. Because the constitutionality of the statute is not before us, I do not address this aspect of the majority opinion on the merits.

¶78 In front of the district court, Iannicelli and Brandt challenged the constitutionality of the statute, both on its face and as applied to them. The district court did not address the facial challenge, finding instead that the statute was unconstitutional as applied. The division avoided review of the as-applied determination, and we subsequently accepted the People's appeal to determine the proper interpretation of "juror" and "a case" in the statute. Having interpreted both terms now, I would remand the matter to the court of appeals with instructions to decide whether the district court correctly concluded that the statute is unconstitutional as applied to Iannicelli and Brandt.

## II. Conclusion

¶79 Because Iannicelli and Brandt openly acknowledge that they seek to deliberately influence jury verdicts, I view their alleged conduct as a threat to the administration of justice, the rule of law, and our democracy. Ironically, Iannicelli and Brandt are motivated by their belief that "the people should have power over government" to prevent "abuse of power." According to them, nullifying jury verdicts "take[s] power away from the government and gives it to the people," thereby keeping the government "in check." These mission statements reflect utter ignorance of trial by jury and its role in our democracy. Iannicelli and Brandt have it backwards. We have trial by jury precisely to keep the government in check. By attempting to nullify jurors' decisions and influence the outcome of jury trials, Iannicelli and Brandt are working to thwart trial by jury; and, in doing so, they are unwittingly trying to take power away from the people to give it to the government—the opposite of what they purportedly intend.

¶80 Inasmuch as the legislature has explicitly forbidden Iannicelli's and Brandt's alleged conduct through the jury tampering statute, the majority errs in approving the dismissal of the charges brought against them. I therefore respectfully dissent. I would reverse and remand for further proceedings.

I am authorized to state that CHIEF JUSTICE COATS joins in this dissent.

16